[Cite as *Gingerich v. Gingerich*, 2025-Ohio-78.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

WAYNE GINGERICH,

    PLAINTIFF-APPELLANT,

CASE NO. 14-24-12

  v.

MARVIN GINGERICH,

O P I N I O N

    DEFENDANT-APPELLEE.

Appeal from Union County Common Pleas Court
Trial Court No. 2021-CV-0178

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision: January 13, 2025

APPEARANCES:

    *Paul W. Mills* for Appellant

    *David R. Watkins* for Appellee

**WILLAMOWSKI, J.**

{¶1} Plaintiff-appellant Wayne Gingerich ("Wayne") brings this appeal from the judgment of the Court of Common Pleas of Union County granting judgment to defendant-appellant Marvin Gingerich, Trustee of the Ora Gingerich Trust ("Marvin"). For the reasons set forth below, the judgment is affirmed in part and reversed in part.

{¶2} The dispute in this case arises out of a question regarding whether Wayne is purchasing a farm from the Ora Gingerich Trust or whether he is merely renting the farm. The property at issue was originally purchased by Wayne's parents, Noah and Fannie Gingerich sometime in the 1970s. In 1985 Noah Gingerich was killed in a farm accident. On November 27, 1986, Fannie Gingerich ("Fannie"), Wayne, and Wayne's siblings entered into a Memorandum of Understanding ("Agreement 1") with Ora Gingerich ("Ora") and his wife, Verna Gingerich ("Verna"). Agreement 1 provided that Fannie would turn over her interest in the property to Ora and Ora would then release his claim against the estate of Noah Gingerich. Additionally, Ora agreed to lease to Wayne six acres of the property that included all the buildings for a period of five years. Ora also agreed that Fannie had the right to repurchase the entire fifty-five acre farm ("the farm") during the next five years and could assign that right to Wayne, who could purchase

the farm for a price of $131,198.54. Fannie then signed a deed to Ora and Verna. Agreement 1 was modified by a second Memorandum of Understanding ("Agreement 2") executed on December 1, 1986, by Ora and Wayne allowing Wayne to lease the entire fifty-five acre property making up the farm for an annual rent of $11,500. The lease provided that Ora would assume the costs of minor repairs and maintenance to the buildings, insurance on the buildings and the real estate taxes on the property.

{¶3} On September 30, 1993, Wayne paid Ora $65,600.00 and Ora signed a document labeled "purchase order" to show that the money had been paid. Additionally, Ora signed a document labeled "The Gingerich Agreement" ("Agreement 3"), which stated that Ora "agreed to sell and finance the 56 acre farm in its entirety" to Wayne. Agreement 3 also indicated that Fannie had released her rights to purchase, in an apparent reference to Agreement 1. Wayne testified that he and Ora had reached an agreement that Wayne would pay the $131,198.54 set forth in Agreement 1 and Ora would finance it at a rate of 8% interest.

{¶4} After Agreement 3 was signed by Ora, Wayne made yearly payments of $5,750.00. Wayne also started paying one-half of the property taxes and for insurance on the property. Additionally, Wayne was responsible for paying for repairs to the structures and for the cost of adding on buildings. When there was a fire in one of the buildings, Wayne's insurance paid for the repairs.

{¶5} At some point in time after Agreement 3 was signed, Ora and Verna both transferred their shares of the farm into the Ora Gingerich Trust. Ora was the trustee for the trust at the time and continued to receive payments on the farm on behalf of the trust. Ora died on December 30, 1998. Upon Ora's death Marvin and his brother, Mark, became the successor trustees.[1] Marvin knew nothing of Ora's business transactions, including information about the status of the farm. According to Marvin, Ora was a business man who loaned money to people and often operated on his word and a handshake. Marvin stated that Wayne had made all payments, though he considered them to be rental payments, not purchase payments. On April 14, 2021, Marvin presented Wayne with a new cash rent lease. Wayne refused to sign it and contacted Marvin to inform him that there was a purchase agreement.

*Procedural History*

{¶6} On December 1, 2021, Wayne filed a complaint for declaratory judgment alleging that there was a land contract to purchase the farm from the documents and conduct of the parties. Wayne also requested that the trial court order Marvin to comply with the terms of the land contract and transfer the title to the farm claiming that Marvin breached the contract. The complaint alleged that the doctrines of promissory estoppel and unjust enrichment applied. On January 11, 2022, Marvin filed an answer to the complaint. Marvin denied the allegations of

---

[1] Mark later died leaving Marvin as the sole successor trustee.

the complaint and alleged the defenses of the statute of limitations, laches, and the statute of frauds as well as others. Marvin filed a counterclaim alleging that Wayne was in breach of contract for underpaying the rent since 1993.[2] Wayne filed his response to the counterclaim, alleging that the lease had been replaced by the land contract in 1993, so the terms of the lease were no longer applicable and asserting multiple affirmative defenses.

{¶7} A trial was held before a magistrate on November 1, 2022. Wayne testified that his parents, Fannie and Noah, had purchased the farm in the 1970s, borrowing the money to do so from Ora. Wayne and his wife, Naomi, moved onto the farm in 1979, but were just renting the home, not farming the land. In 1985, Noah died in a farming accident. At that time, Fannie and Noah still owed Ora money and to secure the debt, the parties entered into Agreement 1 giving Ora the land. The purpose of Agreement 1 was to guarantee that Ora would get repaid the money owed, but also giving Fannie or Wayne the right to rebuy the property for the amount still owed. Wayne was offered the right to purchase the property for approximately $131,100. This amount was determined from the amount Ora lent to Noah to purchase the farm minus the amount already paid.

{¶8} Wayne testified that he and Ora had reached an agreement that instead of just leasing the home, Wayne would lease the entire farm. This was set forth in

---

[2] Notably, the counterclaim does not address the issue of the payment of more than $65,000 in 1993.

Agreement 2 in which Wayne agreed to pay Ora $11,500 per year in rent and Ora agreed to be responsible for maintaining insurance, paying the real estate taxes on the property, and maintaining the structures. In 1993, Wayne told Ora he wanted to buy the farm as set forth in Agreement 1. Although the purchase was outside the five-year window set forth in Agreement 1, no objection to the sale was raised by Ora or Verna. Wayne testified that the sales price was $131,198 as set forth in Agreement 1 and that he made a down payment on September 30, 1993 in the amount of $65,600. Agreement 3 showed that Ora was selling him the farm, financing the sale, and referenced Agreement 1 by indicating that Fannie had waived her right to purchase the farm. Pursuant to the agreement to purchase the property, Wayne would now pay $5,750 per year on the remaining balance due on the property. Additionally, Wayne was then responsible for carrying insurance on the property and for paying one-half of the real estate taxes. According to Wayne, Ora never involved Verna in the business transactions and conducted most of his business transactions verbally. Wayne trusted Ora and agreed to pay Ora interest on the loan for the property at a rate of 8% annually. Over the years, Wayne paid Ora or his successors the yearly payments, writing the checks out to whomever he was instructed.

{¶9} Wayne testified that he wrote the checks to Ora during Ora's life and eventually learned that Ora and Verna had transferred title to the real estate to Ora's

trust, of which Ora was the trustee at that time. After Ora's death, Wayne made the payments to either the trust or to Verna directly, depending upon what was requested. Over the years, Wayne made all of the payments, paid his share of the real estate taxes, and maintained insurance. When there was a fire in one of the barns, Wayne's insurance paid for the damage. The damage to the barn required labor to repair it. Wayne paid Marvin for the work Marvin did to repair the damage.

{¶10} On April 14, 2021, Marvin presented Wayne with a new lease agreement, the first time a new lease had been presented since the original one in 1986. This was the first indication Wayne had that Marvin did not know that he was purchasing the property. Wayne refused to sign the lease and informed Marvin of the purchase agreement. Wayne then offered Marvin a payment with the memo "land contract payment", but Marvin refused to accept it. Wayne eventually gave Marvin a payment with the memo line blank, which Wayne accepted. On cross-examination, Wayne admitted that he did not exercise the option to purchase the land within the five years specified in Agreement 1. Wayne also admitted that he did not use the term "land installment contract" until 2021, instead just referring to it as a "purchase on the farm". Tr. 52. Wayne concedes that the purchase agreement did not comply with the statutory requirements for land contracts as everything was conducted verbally. However, Wayne noted that neither Ora nor Verna referred to the agreement as a lease after 1993 and that Ora did not claim that the purchase

option had expired when he accepted the down payment of $65,600 in 1993 and signed Agreement 3.

{¶11} Marvin testified on cross-examination that he knew nothing about Agreement 1, Agreement 2, or Agreement 3. Marvin admitted that Ora had signed the Agreements and that there was a payment of $65,600 made to Ora in 1993. Marvin provided no alternative explanation as to why the payment was made. Marvin admitted that Wayne had made all the payments, but claimed they were rental payments because he did not believe Verna would have sold her share of the farm. However when asked if he ever discussed the matter with Verna, Marvin admitted he had not done so.[3] Regardless of whether Verna intended to sell the farm to Wayne, she did transfer it to Ora's trust before Ora died, and Ora was the sole trustee until his death on December 30, 1998. After Ora's death, Marvin and his brother, Mark,[4] were the co-trustees. Marvin also admitted that when he received the property taxes for the farm, he wrote "Wayne's farm" on the documents and that Wayne paid the taxes. Marvin further admitted that the property taxes and insurance should have been paid by the trust if it was a lease because tenants do not pay taxes or property insurance. When questioned about being paid for his work on repairing

---

[3] This Court notes that whether Verna agreed to sell the real estate is not relevant. Verna voluntarily transferred her share of the real estate into Ora's trust. Ora was the one who made the agreement and was the trustee of the trust. As trustee he could ratify the agreement by continuing to act as if there was a sales contract. This ratification would then bind successor trustees.

[4] Mark later died leaving Marvin as the sole successor trustee.

the barn, Marvin acknowledged that tenants generally do not pay for repairs to structures after a fire as that is the responsibility of the owner. Marvin denied maintaining insurance on the property until 2017 or 2018 when he decided to purchase liability insurance for the property.

{¶12} Marvin testified that Ora was a "sharp" businessman and handled his own affairs, operating on his word and a handshake. At no time did Ora ever discuss the status of the farm with Marvin, and Marvin never questioned the agreement because everyone was happy with the way things were. Marvin testified that he never agreed to sell the property, as successor trustee, and considered all of the payments to be rent.

{¶13} Chandler Eash ("Eash") testified on behalf of Wayne. Eash prepared an amortization schedule on the property using a beginning balance of $65,598.54, payments of $5,750 per year, and an interest rate of 8%. As of the June 2022 payment, the balance on the farm would have been $13,258.30.

{¶14} Naomi testified that she was not involved in the purchase because in Amish culture, the husband transacts business for the family and wives are not involved. However, she understood there was an agreement between Wayne and Ora for Wayne to purchase the property from Ora. Naomi admitted that she wrote "lease payment" on one of the payment checks, but indicated that it was just a term

used loosely and not indicative that the farm was still being leased rather than purchased.

**{¶15}** After Wayne rested his case, Marvin presented the testimony of Douglas William Boy ("Boy"). Boy testified that Wayne's taxes did not appropriately deal with the property if it was a land installment contract because Wayne did not depreciate the value of the buildings. This mistake prevented Wayne from using all available deductions. However, Boy admitted that no one is required to take depreciation. Boy also admitted that Wayne prepared his own taxes rather than utilizing a professional, so Wayne likely did not understand the tax ramifications. Although the trust would have had an obligation to report a sale, Boy did not review the trust tax returns to know what they said, so Boy was not able to give an opinion whether a sale actually occurred.

**{¶16}** Following the testimony, the magistrate took the matter under advisement. On November 27, 2023, the parties filed a joint motion for the court to render a decision. The magistrate issued her decision finding in favor of Marvin on December 1, 2023. Wayne filed objections to the magistrate's decision on December 14, 2023, alleging that 1) the land contract did not violate the statute of frauds and was a valid executory contract, 2) the evidence supported a finding based on the doctrine of partial performance, 3) Wayne was entitled to a declaratory judgment and specific performance of the contract, and 4) the evidence supported a

finding of unjust enrichment. Marvin filed a memorandum contra to the objections on December 20, 2023. On January 3, 2024, the trial court overruled the objections and entered judgment for Marvin. Wayne appealed from this judgment and on appeal raises the following assignments of error.

## First Assignment of Error

**The trial court erred in failing to find [Wayne] entered into a valid land installment contract with [Marvin] which did not violate the statute of frauds based on the totality of the evidence.**

## Second Assignment of Error

**The trial court erred in failing to find in favor of [Wayne] based on partial performance.**

## Third Assignment of Error

**The trial court erred in failing to find in favor of [Wayne] on his claim for unjust enrichment.**

## Fourth Assignment of Error

**The trial court erred in failing to determine [Wayne] was entitled to favorable decisions in his claims for declaratory judgment, specific performance, quiet title, promissory estoppel and breach of the contract since the evidence supported a finding of a valid executory contract.**

*Standard of Review*

{¶17} The complaint in this case was a request for declaratory judgment.

Although broad in scope, the declaratory judgment statutes are not without limitation. Most significantly, in keeping with the long-standing tradition that a court does not render advisory opinions, they allow the filing of a declaratory judgment only to decide "an actual

> controversy, the resolution of which will confer certain rights or status upon the litigants." [*Corron v. Corron*, 40 Ohio St.3d 75, 79 (1988).] Not every conceivable controversy is an actual one. As the First District aptly noted, in order for a justiciable question to exist, "'[t]he danger or dilemma of the plaintiff must be present, not contingent on the happening of hypothetical future events . . . and the threat to his position must be actual and genuine and not merely possible or remote.'" [*League for Preservation of Civil Rights v. Cincinnati*, 64 Ohio App. 195, 197 (1st Dist. 1940) quoting Borchard, Declaratory Judgments (1934) 40.]

*Mid-American Fire & Cas. V. Heasly*, 2007-Ohio-1248, ¶ 9. Where a trial court determines that a controversy is too contingent and that declaratory relief does not lie, an appellate court will not reverse it absent an abuse of discretion. *Id*. at ¶ 12. However, the abuse of discretion standard applies to declaratory judgment actions dismissed as not justiciable. *Arnott v. Arnott*, 2012-Ohio-3208, ¶ 13. "[O]nce a trial court determines that a matter is appropriate for declaratory judgment, its holdings regarding questions of law are reviewed on a de novo basis." *Id*.

*Land Installment Contract*

{¶18} In the first assignment of error, Wayne claims that the trial court erred in not finding a valid land installment contract which satisfied the statute of frauds in this case. All contracts for the sale of lands must be "in writing and signed by the party to be charged therewith" as is set forth in R.C. 1335.05, otherwise known as Ohio's statute of frauds. "The statute of frauds is essentially an evidentiary rule the purpose of which is to protect the integrity of certain enumerated contractual transactions." *Crilow v. Wright*, 2011-Ohio-159, ¶ 33 (5th Dist.). In other words,

the statute of frauds is designed to prevent frauds and perjuries. *Olympic Holding Co., L.L.C. v. ACE Ltd.*, 2009-Ohio-2057, ¶ 33.

> To satisfy the statute of frauds, "[t]he writing does not need to contain all the terms of the agreement between the parties." . . . Instead, " ' "[a]ny signed memorandum is sufficient to satisfy the Statute of Frauds so long as it (1) identifies the subject matter of the agreement, (2) establishes that a contract has been made, and (3) states the essential terms with reasonable certainty." ' " . . . "As to essential terms, the essential terms of a contract are 'the identity of the parties to be bound, the subject matter of the contract, consideration, a quantity term, and a price term.' " . . . " 'If the writing does not contain words which can reasonably be construed as words of promise or agreement, the writing is not a memorandum for purposes of the Statute of Frauds.' "

*Canter v. Garvin*, 2021-Ohio-99, ¶ 28 (3d Dist.) (citations omitted). The question of whether a document satisfies the statute of frauds is one of law and is reviewed de novo. *Id*. at ¶ 29. The statute of frauds may be satisfied by multiple writings which form one memorandum. *Javorsky v. Sterling Med.*, 2015-Ohio-2113, ¶ 31 (7th Dist.).

{¶19} A land installment contract is defined as "an executory agreement which by its terms is not required to be fully performed by one or more of the parties to the agreement within one year of the date of the agreement and under which the vendor agrees to convey title in real property located in this state to the vendee and the vendee agrees to pay the purchase price in installment payments, while the vendor retains title to the property as security for the vendee's obligation." R.C. 5313.01(A). The requirements for a land installment contract are set forth in R.C.

5313.02, which requires at a minimum 1) the full names and then current mailing addresses of all the contract parties, 2) the dates when each party signed the contract, 3) the property's legal description, 4) the contract price, 5) any separate charges or fees, 6) the amount of the down payment, 7) the remaining principal, 8) the due dates and amount of each installment payment, 9) the interest rate and method of computation, 10) a statement of encumbrances, 11) statement requiring the vendor to deliver a deed upon completion of the contract, 12) a provision requiring the vendor to prove they own the property, 13) a provision that the vendee can get credit for any payments made on the mortgage , 14) a provision that the vendor will record a copy of the contract, 15) requirement that the vendee will be responsible for the payment of taxes from the date of the contract, unless agreed to the contrary, and 16) a statement of any pending order against the property.  R.C. 5313.02(A).  Additionally, each land installment contract shall comply with the statutory formalities required for the execution of deeds and mortgages.  R.C. 5313.02(D).

{¶20} The evidence as to this matter is not really disputed.  No one claims that there is a single document which fulfills all of the requirements set forth in R.C. 5313.02 or the statute of frauds.  Although there are multiple documents which can be reviewed as all part of one memorandum, they also do not satisfy all of the statutory requirements.  Agreement 1 lists the full names of the parties, but provides no current mailing addresses.  Agreement 3 and Ex. BB provide a date where Ora

signed the purchase agreement and accepted the check, but there is no signature by Wayne showing he wished to enter a land installment contract. Exhibit A did provide a legal description for the real estate and is labeled "Gingerich Property". Agreement 1 lists a purchase price as $131,198.54 and appears to be reincorporated by the reference in Agreement 3 to Fannie releasing her right to purchase. Ex. BB provides a receipt for the down payment. Agreement 2 set forth when payments for the lease would be due and set forth an interest rate of 8% for any money borrowed by Wayne from Ora. However, there is no dispute that the writings do not satisfy all of the statutory requirements. For this reason the first assignment of error is overruled.

*Partial Performance*

{¶21} Although the alleged contracts did not satisfy the statute of frauds or every statutory requirement for land installment contracts, that is not the end of our inquiry. An agreement that fails to satisfy the statute of frauds or the statutory requirements for a land installment contract may still be enforceable if the parties partially performed the contract. *Delfino v. Paul Davies Chevrolet, Inc.*, 2 Ohio St.2d 282 (1965). "[I]n situations where it would be inequitable to permit the statute to operate and where the acts done sufficiently establish the alleged agreement to provide a safeguard against fraud in lieu of the statutory requirements", the equitable doctrine of part performance may apply. *Id*. at 286-87. For the doctrine to apply,

the part performance requires unequivocal acts based upon the agreement which show the party has changed his position to their detriment and makes it impractical to place the parties in status quo. *Hamilton v. Barth*, 2022-Ohio-3451, ¶ 15 (1st Dist.). If there are reasonable explanations for the acts for another reason, the case remains in the operation of the statute. *Delfino* at 287.

> [A]cts which do no unmistakably point to a contract existing between the parties, or which can be reasonably accounted for in some other manner than as having been done in pursuant of a contract, do not constitute a part performance sufficient in any case to take it out of the operation of the statute [of frauds], even though a verbal agreement has actually been made between the parties.

*JP Morgan Chase Bank, N.A. v. Spears*, 2018-Ohio-917, ¶ 14 (3d Dist.). Regarding contracts concerning interests in real estate, Ohio courts have considered the following factors to be relevant in determining whether the partial performance doctrine applies: 1) evidence of change in possession; 2) payment of all or part of the consideration; and 3) improvements, alterations or repairs upon the land by the possessor. *Canter v. Garvin*, 2021-Ohio-99, ¶ 42 (3d Dist.).

{¶22} A review of the record in this case shows that the evidence is largely undisputed. Wayne testified there was a verbal agreement between him and Ora for Ora to sell the farm to Wayne at the terms set forth in Agreement 1. Agreement 1 sets a purchase price. Agreement 2 shows what interest rate Ora charged for loans. Agreement 3 indicates that Ora intended to sell the farm to Wayne and finance the sale for Wayne. There was a down payment of $65,600 paid to Ora for the farm as

shown by the receipt signed by Ora. No one disputes that the money was received and only Wayne provides an explanation for why the money was paid. Marvin provides no reasonable alternative explanation. Additionally, Wayne testified that he thereafter made yearly payments of $5,750 towards the purchase of the farm. Marvin does not deny that this occurred, though he claims they were rental payments. However, the amount was not equal to the amount of annual rent for the farm set forth in Agreement 2. These payments were made and accepted without question from 1993 to 2021 by Ora, Ora in his role of trustee, Verna, and Marvin. The undisputed testimony was that at the time of the hearing in 2022, Wayne had paid almost $118,000 of the original principal of $131,198.54 owed. Marvin presented no reasonable alternative explanation for why the down payment was made or for the reduction in payments from the lease agreement at trial. Thus, there was substantial evidence that Wayne had paid nearly 90% of the purchase price set forth in Agreement 1 and testified to be the purchase price by Wayne.

{¶23} Additionally, Wayne testified that he had paid the insurance since 1993 and paid a portion of the real estate taxes since then as well. This is a change of circumstances from the lease which required Ora, as the landowner to pay those items. Marvin did not deny that Wayne had paid the taxes and even indicated that he had marked the real estate tax bills with the words "Wayne's farm". Marvin also admitted that the trust, as the landlord, should have paid these expenses pursuant to

-17-

the terms of the lease if there were no agreement for Wayne to purchase the land. Marvin, as trustee of the trust which owned the legal title to the real estate, did not purchase insurance on the property until 2017-2018 when he obtained liability only insurance. When there was a fire on the premises, Wayne's insurance paid for the damage to the physical structure, as well as for Wayne's personal property losses. Marvin admitted that generally the land owner is responsible for damage to the real property and Agreement 2 indicates that the land owner would bear the cost of that. Yet, Wayne was the one to bear the costs. When the barn needed repairs due to the fire, Wayne paid Marvin for the work he did on the structure. Marvin admitted that the land owner should be the one paying for the repairs, not a tenant. Marvin presented no explanation as to why the trust was not paying these expenses that would contradict Wayne's testimony. Wayne also testified that he had added on to the structures on the property. This evidence shows that Wayne, as the possessor of the land, had made repairs and improvements to the land, none of which were paid for by Ora, Verna, or the trust.

{¶24} The first factor was a change of possession. In this case, Wayne was already in possession of the real estate as he was the tenant. Over the years he remained in the home and continued to farm the land. Although there was no obvious change of possession, there was a change of position to Wayne's detriment. Pursuant to Agreement 1, he was not required to pay the real estate taxes or maintain

insurance on the physical structures. He was not also responsible for general maintenance. After the 1993 agreement, Wayne took on those responsibilities. Wayne relied upon his agreement with Ora to his detriment. Ora, as landowner and later the trustee, and Marvin, as successor trustee, benefitted from Wayne's change in position.

{¶25} After reviewing all of the evidence presented at trial, it is clear that both parties have performed in a manner indicating a contract was present. Neither party was following the original terms of Agreement 2. Wayne took on extra obligations which would normally be the responsibility of the land owner. Marvin, as successor trustee, acted as if Wayne was purchasing the property by ceding the land owner's responsibilities to Wayne. The only evidence presented at the trial from first-hand knowledge of the situation came from Wayne. Marvin repeatedly testified that he had no first-hand knowledge. Although Marvin speculates as to alternative reasons for the down payment on appeal, the record contains no evidence to support these speculations. Speculation may not be the basis for a judgment. The evidence shows that there was partial performance by both sides. Thus, the agreement may be enforced.

{¶26} On appeal, Marvin argues that there was no agreement to be enforced. Marvin claims that there was no evidence as to why the $65,600.00 payment was made. However, this argument is not accurate. Wayne testified that he paid the

$65,600.00 payment as a down payment on the purchase. Agreement 3 indicated that Ora was selling the farm to Wayne and referenced Agreement 1 by indicating that Fannie had waived her right to purchase. Wayne presented a receipt signed by Ora showing that he received the payment and bearing the notation "Payment on Kramer Rd. Property". Ex. BB. All of this is evidence that there was an agreement and it was not disputed. Marvin argues that maybe it could have been for another reason. However, no evidence was presented that it was for another reason. Based upon the evidence entered at trial, only one explanation was given and any other reason would be pure speculation with no evidence to support it.

{¶27} Marvin also argues that declaratory judgment is improper because Wayne did not file a claim against either Ora's or Verna's estates to get title to the farm. However, by the time Ora, and later Verna, died, the farm was owned by the trust.[5] Thus, the estates had no ownership rights to give. Likewise, the argument that Verna never intended to sell the land fails for the same reason. Whether she agreed to do so is irrelevant because she no longer had any ownership interest in the land after it was transferred into Ora's trust.

{¶28} A review of the evidence presented at trial leads to one reasonable conclusion – there was an agreement between Ora and Wayne for Ora to sell the

---

[5] No deed was presented showing the property was owned by the trust. However, all parties agreed that it was. Additionally, copies of the tax records show that before and after Verna's death, the owner of the property was the trust. No one disputes that the trust was the owner of the real estate or indicates that the trust had ever transferred the real property to a beneficiary, such as Verna.

property to Wayne and for Wayne to purchase the property from Ora. The actions of both Wayne and Marvin indicate that there was some sort of an agreement as both parties acted as if Wayne were the owner. Marvin admits that Wayne made all the payments that were due and owed. The evidence is clear that the parties were no longer acting under the terms of the lease signed in 1986 and no evidence was presented that a different lease was in effect. There was partial performance that would remove this agreement from the requirements of the statute of frauds and the statute of conveyance. The second assignment of error is sustained.

{¶29} In the fourth assignment of error Wayne claims that the trial court erred by failing to grant his claim for declaratory judgment granting specific performance of the sale of the property to Wayne. As we have sustained the second assignment of error, the trial court did err in failing to grant the declaratory judgment requested. The fourth assignment of error is also sustained.

*Unjust Enrichment*

{¶30} Wayne claims in the third assignment of error that the trial court erred by denying him recovery on the grounds of unjust enrichment. Since the judgment of the trial court is being reversed regarding the sale of the real estate, the claim of unjust enrichment is made moot. Wayne will recover the property upon completion of his installment payments and thus, there is no unjust enrichment caused by

finding the sales agreement unenforceable. This court need not rule on a moot issue. App.R. 12(A)(1)(c).

**{¶31}** Having found error prejudicial to the Appellant in the particulars assigned and argued, the judgment of the Court of Common Pleas of Union County is affirmed in part and reversed in part. The matter is remanded for further proceedings in accord with this opinion.

*Affirmed in Part, Reversed*
*in Part and Cause Remanded*

**WALDICK, P.J. and ZIMMERMAN, J., concur.**

**/hls**