[Cite as *Maynard v. Barkley*, 2025-Ohio-1890.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

MICHAEL MAYNARD,

    PLAINTIFF-APPELLEE

    CASE NO. 9-24-41

V.

DERICK A. BARKLEY,

    OPINION AND
    JUDGMENT ENTRY

    DEFENDANT-APPELLANT.

Appeal from Marion County Common Pleas Court
General Division
Trial Court No. 24 CV 255

Judgment Affirmed

Date of Decision: May 27, 2025

APPEARANCES:

    *Rocky Ratliff* for Appellant

    *Thomas A. Frericks* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Derick A. Barkley ("Barkley") appeals the judgment of the Marion County Court of Common Pleas, arguing that the trial court erred in finding that he had waived his right to a jury trial; in determining that the agreement between the parties was a lease agreement; and in dismissing his counterclaims. For the reasons set forth below, the judgment of the trial court is affirmed.

*Facts and Procedural History*

{¶2} Barkley routinely performed work as a contractor on a number of rental properties that Michael Maynard ("Maynard") owned. In 2004, Maynard purchased a house on Marseilles-Galion Road West. After Maynard allotted $10,000.00 to the renovation of this property, Barkley moved into this newly purchased house. For over a decade he made monthly payments of $615.00 to Maynard. The amount of this monthly payment was later raised to $700.00 pursuant to a discussion between Barkley and Maynard.

{¶3} In the year following Maynard's purchase of this house, Barkley stated that he "gutted . . . two thirds" of the house. (Tr. 99). He performed extensive renovations, testifying that, among other improvements, he installed new wiring, siding, plumbing, doors, a bathroom, a well pump, and a garage door. By July of

2022, Barkley had stopped making monthly payments to Maynard. On April 5, 2024, Maynard's property manager, Jane A. Metz ("Metz"), posted a notice to leave the premises on the door of the house where Barkley was living.

**{¶4}** On April 10, 2024, Maynard filed a complaint in forcible entry and detainer ("FED") that sought possession of the property on Marseilles-Galion Road West. He alleged that Barkley was a tenant who was past due on his rental payments. On April 19, 2024, Barkley filed an answer and counterclaims that alleged he had entered into a written land contract with Maynard for the house; had completed the required payments; and was the true owner of the property. However, Barkley admitted in his answer that this land contract was not recorded and that he could not locate a written copy of this alleged agreement.[1]

**{¶5}** On June 26, 2024, Maynard filed a motion that challenged the portion of Barkley's answer that demanded a jury trial. He argued that Barkley did not timely demand a jury trial in the FED action in accordance with R.C. 1923.09. The trial court found that Maynard's argument had merit and also found that Barkley had failed to make the required jury deposit in compliance with Loc.R. 207(d). For these reasons, the trial court concluded that Barkley was not entitled to a jury trial.

---

[1] Maynard originally filed this action in the Marion Municipal Court. However, this case was transferred to the Marion County Court of Common Pleas on May 10, 2024 after Barkley filed counterclaims that alleged he suffered damages in excess of $25,000.00.

{¶6} On April 30, 2024, Maynard filed a Civ.R. 12(B)(6) motion to dismiss Barkley's counterclaims. He argued that Barkley failed to attach a copy of the contract to his complaint and that absence of a written land contract meant he could not satisfy the statute of frauds. On July 19, 2024, the trial court denied Maynard's motion to dismiss, finding that a decision could not be made based solely upon the contents of the complaint.

{¶7} On August 9, 2024, nine witnesses were called to testify at a bench trial before a magistrate. Maynard stated that he had an oral lease agreement with Barkley under which rent was set at $615.00 until 2015, when the rent was raised to $700.00 a month. He testified that no land contract existed for the property at issue. Maynard also said that he did not ask Barkley to perform a number of the renovations that were made to the house but explained that the monthly rent was "615 and not a thousand six hundred" as the expectation was that Barkley would "maintain the house." (Tr. 31).

{¶8} Barkley testified that he and Maynard signed a written land contract for the purchase of this house in 2004. However, he testified that he could not find a written copy of this agreement but said that they also had an oral agreement for the purchase of the house. Since Maynard paid $44,000.00 for the house and provided a loan of $10,000.00 to renovate the premises, Barkley testified that the total purchase price for the house was $54,000.00.

**{¶9}** Barkley stated that his monthly payments were initially "five something" for about eighteen months but that this amount was then raised to $615.00. He testified that, once he believed the amount due on the land contract was paid, he stopped making payments for sixteen months until Maynard approached him in 2020 and indicated that another $15,000.00 was due on the land contract. The monthly payment was then raised to $700.00. Barkley stated that he then made a total of twenty-four monthly payments of $700.00 through June of 2022. He testified that he believed that he came to own the house under the land contract after tendering these twenty-four payments.

**{¶10}** On August 16, 2024, a decision was issued in which the magistrate found Maynard's testimony to be "reasonably straightforward" and "credible." (Doc. 34). After examining the internal consistency of the figures produced by Barkley, the magistrate concluded that his testimony was "inconsistent and contradictory." (Doc. 34). The magistrate also noted that Barkley was not able to remember many of the terms of the alleged land contract and ultimately found that his testimony was not credible.

**{¶11}** Based on these findings and the evidence produced by the parties, the magistrate concluded that Barkley had not only failed to produce a written copy of the alleged land contract but also failed to produce evidence that could establish the terms of this alleged agreement. The magistrate then concluded that an oral lease

agreement had existed between the parties and that Barkley had not paid the rent that was due in April of 2024. For these reasons, the magistrate concluded that Maynard should be granted restitution of the premises and that Barkley's counterclaims should be dismissed with prejudice.

{¶12} On August 16, 2024, the trial judge signed an interim order that granted Maynard's request for FED. This interim order specified that the counterclaims would be resolved after any objections to the magistrate's order had been addressed. The trial court then granted a stay of execution, pending an appeal of the FED order.

{¶13} Barkley filed his notice of appeal on August 19, 2024 from the interim order that granted Maynard's request for FED.[2] On appeal, he raises the following three assignments of error:

**First Assignment of Error**

**The trial court erred when it decided the complaint in forcible entry and detainer rather than it being tried to a jury with all remaining issues.**

**Second Assignment of Error**

**The trial court erred when it determined the agreement between the parties was a lease agreement and awarded possession to appellee.**

---

[2] At the time that Barkley's notice of appeal was filed, no ruling on the counterclaims had been issued from the trial court.

**Third Assignment of Error**

**The trial court erred in dismissing appellant Barkley's counterclaims following the forcible entry and detainer hearing.**

*First Assignment of Error*

**{¶14}** Barkley argues that the trial court incorrectly concluded that he was not entitled to a jury trial in this case.

Legal Standard

**{¶15}** R.C. 1923.10 indicates that the "[p]arties to a forcible entry and detainer action have the right to a jury trial." *Showe Management Corporation v. Mountjoy*, 2020-Ohio-2772, ¶ 14 (3d Dist.). However,

> the Ohio Supreme Court has held that local rules that require an advance deposit as security for the cost of a jury trial and that provide that failure of a party to advance the deposit constitutes a waiver of the right to a jury trial are 'moderate and reasonable regulations of the right to a trial by jury.'

*Arlington Natural Gas Co. v. Martens*, 2007-Ohio-5479, ¶ 15 (3d Dist.), quoting *Walters v. Griffith*, 38 Ohio St.2d 132, (1974), at syllabus.

**{¶16}** Loc.R. 207(d) of the General Division of the Marion County Court of Common Pleas reads, in its relevant part, as follows:

> If a party is seeking a jury trial in a civil case, the party must submit a $500 jury deposit to the clerk of courts within 10 days of making the request. . . Failure to make the jury deposit within 10 days of making the request will be deemed to be a waiver of the jury by that party.

"A trial court retains discretion to grant or deny a request for a jury trial where a party fails to comply with the applicable local rule . . . ." *American Hotel Group, LLC v. Wyandotte Plaza, LLC*, 2017-Ohio-5520, ¶ 13 (10th Dist.). Thus, appellate courts will not reverse such a decision in the absence of an abuse of discretion. *Id.* An abuse of discretion is more than an error of judgment but is present when a determination is arbitrary, unreasonable, or unconscionable. *Universal Steel Buildings Corp. v. Dues*, 2024-Ohio-698, ¶ 139 (3d Dist.).

Legal Analysis

{¶17} On May 28, 2024, this case was transferred from the municipal court to the court of common pleas. On June 21, 2024, the trial court issued a judgment entry that stated it "ha[d] checked with the Clerk's records and f[ound] that no party ha[d] made the required jury deposit within the required time." (Doc. 12). For this reason, the trial court concluded that Barkly had failed comply with Loc.R. 207(d) and had, as a result, waived any right to a jury trial in this case. *See Sallock v. Tillimon*, 2023-Ohio-3193, ¶ 51 (6th Dist.). Having examined the contents of the record, we conclude that Barkley has failed to raise an argument that demonstrates the trial court abused its discretion in concluding that he waived his right to a jury in this case. Accordingly, the first assignment of error is overruled.

*Second Assignment of Error*

**{¶18}** Barkley argues that the trial court erred in granting the FED on the basis that an oral lease agreement existed between the parties.

Legal Standard

**{¶19}** "Forcible entry and detainer, as authorized in R.C. Chapter 1923, is a summary proceeding and is intended to serve as an expedited mechanism by which an aggrieved landlord may recover possession of real property." *Williams Pointe Holdings, LLC v. Rude*, 2025-Ohio-133, ¶ 21 (12th Dist.).

> To prevail in a forcible entry and detainer action, plaintiff must prove: (1) that the plaintiff met the procedural requirements and properly served the tenant with notice of the eviction, (2) the plaintiff has the right to possess the premises, and (3) the tenant does not have the right to possession.

*Henry Cty. Land Reutilization Corp. v. Pelmear*, 2022-Ohio-4231, ¶ 11 (3d Dist.), quoting *Garb-Ko, Inc. v. Benderson*, 2013-Ohio-1249, ¶ 54 (10th Dist.). "R.C. 1923.02(A)(2), in pertinent part, provides that eviction proceedings may be had '[a]gainst tenants . . . in possession under an oral tenancy, who are in default in the payment of rent[.]'" *Snyder v. Wylie*, 2017-Ohio-7990, ¶ 20 (6th Dist.), quoting R.C. 1923.02(A)(2).

Standard of Review

**{¶20}** "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as

being against the manifest weight of the evidence." *Sotnyk v. Guillenno*, 2014-Ohio-3514, ¶ 4 (6th Dist.). "In determining whether a judgment is supported by competent, credible evidence, '[i]t is axiomatic that considerations of credibility and questions of weight are primarily for the trier of fact, not the reviewing court.'" *Davidson v. Hatcher*, 2022-Ohio-4452, ¶ 30 (3d Dist.), quoting *Cooke v. Strader's Garden Ctrs., Inc*., 1996 WL 145496, *6 (10th Dist. Mar. 28, 2020).

Legal Analysis

**{¶21}** Barkley argues that the trial court should not have granted the FED because the agreement between the parties was not an oral lease rather but was a land contract. "A lease is an agreement that conveys a right to possess real property for a limited term, under specified conditions, and in consideration of rent." *Slak v. Strozier*, 2024-Ohio-286, ¶ 26 (6th Dist.). In contrast,

> a land contract is defined as 'an executory agreement . . . under which the vendor agrees to convey title in real property located in this state to the vendee and the vendee agrees to pay the purchase price in installment payments, while the vendor retains title to the property as security for the vendee's obligation.'

*Harding v. Ohio Real Estate Commission*, 2023-Ohio-3138, ¶ 33 (6th Dist.), quoting R.C. 5313.01.

> The requirements for a land installment contract are set forth in R.C. 5313.02, which requires at a minimum 1) the full names and then current mailing addresses of all the contract parties, 2) the dates when each party signed the contract, 3) the property's legal description, 4) the contract price, 5) any separate charges or fees, 6) the amount of the down payment, 7) the remaining principal, 8) the due dates and

amount of each installment payment, 9) the interest rate and method of computation, 10) a statement of encumbrances, 11) statement requiring the vendor to deliver a deed upon completion of the contract, 12) a provision requiring the vendor to prove they own the property, 13) a provision that the vendee can get credit for any payments made on the mortgage, 14) a provision that the vendor will record a copy of the contract, 15) requirement that the vendee will be responsible for the payment of taxes from the date of the contract, unless agreed to the contrary, and 16) a statement of any pending order against the property.

*Gingerich v. Gingerich*, 2025-Ohio-78, ¶ 18 (3d Dist.), quoting R.C. 5313.02(A). Under Ohio's statute of frauds, "[a]ll contracts for the sale of lands must be 'in writing and signed by the party to be charged therewith . . . .'" *Gingerich* at ¶ 18, quoting R.C. 1335.05.

**{¶22}** At trial, Barkley asserted that a written land contract had existed but that he could not locate his copy. No land contract was ever recorded for the property at issue. Barkley also did not present a written memorandum or note that contained any term of the alleged agreement or contained any indication that a written land contract existed. *See* R.C. 1335.05. The finder of fact noted that "the Defendant [Barkley] could have recorded the document had it existed" and found that the claims about the existence of a written agreement were "false." (Doc. 34), citing R.C. 5313.02(C). In the absence of any writing, the magistrate concluded that the statute of frauds operated to bar enforcement of the agreement.

**{¶23}** But Barkley also testified that he and Maynard "had a verbal agreement as well." (Tr. 92). On appeal, he raises two arguments to establish that

this oral contract is not subject to the statute of frauds.[3]  First, Barkley asserts that the doctrine of part performance applies to this oral agreement.  This equitable doctrine can prevent the statute of frauds from barring the enforcement of an unwritten agreement where "unequivocal acts based upon the agreement . . . show the party has changed his position to their detriment and makes it impractical to place the parties in status quo." *Gingerich,* 2025-Ohio-78, ¶ 21.  However,

> acts which do not unmistakably point to a contract existing between the parties, or which can be reasonably accounted for in some other manner than as having been done in pursuance of a contract, do not constitute a part performance sufficient in any case to take it out of the operation of the statute [of frauds] . . .

*JP Morgan Chase Bank, N.A. v. Spears*, 2018-Ohio-917, ¶ 14 (3d Dist.), quoting *Hughes v. Oberholtzer*, 162 Ohio St. 330, 339-340 (1954).  Thus, "[i]f there are reasonable explanations for the acts for another reason, the case remains in the operation of the statute" of frauds.  *Gingerich* at ¶ 21.

**{¶24}** Importantly, "[a] party seeking to enforce an oral land contract must establish *both* the contract and the applicability of the doctrine of part performance by clear and convincing evidence."  (Emphasis added.)  *Verhoff v. Verhoff*, 2019-Ohio-3836, ¶ 21 (3d Dist.), quoting *Watts v. Fledderman*, 2018-Ohio-2732, ¶ 24 (1st Dist.).  *See also* 37 C.J.S., Statute of Frauds, § 183 (2024) ("Part performance

---

[3] In the trial court, one of Barkley's arguments asserted that the statute of frauds did not apply because a written land contract existed.  The finder of fact concluded that these allegations were "false."  (Doc. 30).  He does not reassert this argument on appeal.  Rather, he only argues that a separate, oral land contract that allegedly existed between the parties falls within two exceptions to the requirements of the statute of frauds.

is not a substitute for proof of the terms of the alleged contract; only a contract which is certain and definite in all its essential particulars is enforceable under the rule.").

> Clear and convincing evidence is that measure or degree of proof which will produce in the mind of the trier of facts a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as is required beyond a reasonable doubt as in criminal cases.

*Cross v. Ledford*, 161 Ohio St. 469, 477 (1954). Questions concerning the application of the statute of frauds and the doctrine of part performance raise legal questions that are reviewed de novo on appeal. *Verhoff* at ¶ 21, citing *Crilow v. Wright*, 2011-Ohio-159, ¶ 27 (5th Dist.).

{¶25} In this case, the finder of fact concluded that Barkley failed "to articulate the terms [of the agreement] and meet the burden of production of the alleged terms of the contract to be enforced." (Doc. 34). We turn to examining the evidence presented at trial. As to the purchase price, Barkley said that he agreed to pay $54,000.00 for the house since Maynard bought this property for $44,000.00 and loaned him $10,000.00 to improve the residence.

{¶26} As to the term of the land contract, Barkley testified that he could not "remember a hundred percent what the paper [the alleged written land contract] stated" but that he and Maynard had "discussed" a fifteen-year term in 2004. (Tr. 105, 107). However, Barkley's trial testimony provides no explanation as to why he was making monthly payments eighteen years later in 2022.

**{¶27}** As to the interest rate, Barkley said, "I don't recall what the land contract stated . . . the interest rate [was]." (Tr. 106). He testified that Maynard told him that he "was gonna pay whatever it was that he [Maynard] was paying . . . . If [the interest rate] went up, then I paid what it went up. If it went down, then I would pay what it went down." (Tr. 111). While Barkley seemed to be describing a "variable interest rate," his subsequent testimony alleged that his monthly payment was only adjusted two times in eighteen years. (Tr. 111).

**{¶28}** As to his payment schedule, Barkley alleged that, after moving into the house in 2004, he made eighteen monthly payments of $567.00 until his monthly payment was raised to $615.00 in September 2005. He affirmed that this monthly payment remained unchanged for roughly fifteen years. Barkley testified that, when he believed he had fulfilled the terms of the land contract, he stopped making payments for roughly "sixteen months" until Maynard indicated in 2020 that $15,000.00 "and a little interest money" remained to be paid. As a result, the monthly payment was raised to $700.00 in July 2020.[4] (Tr. 96, 112). Barkley stated that, after twenty-four months, he stopped making payments in June 2022, believing that he came to own the house at that time.

---

[4] In his answer and counterclaims, Barkley alleged that the amount of the monthly payment was raised to $700.00 in October 2019 while also alleging that the twenty-four payments of $700.00 began in July 2020. The trial court issued an order requesting clarification on this inconsistency. Barkley acknowledged the inconsistency and clarified that the monthly payments of $700.00 began in July 2020.

**{¶29}** In examining these figures, the magistrate noted that, in 2020, Barkley purportedly owed $15,000.00 plus interest on the land contract and then made twenty-four payments of $700.00 that totaled $16,800.00. The magistrate pointed out that an interest rate of over eleven percent is implied by the fact that it took $16,800.00 to pay off the remaining balance of $15,000.00 with interest.

**{¶30}** In the decision making process, the magistrate examined how a $54,000.00 purchase price would have been reduced over a fifteen-year term by the monthly payments described by Barkley. According to Barkley, $15,000.00 of the $54,000.00 purchase price remained to be paid in 2020. However, the magistrate indicated that, even at an interest rate of eleven percent, the interest and principal would have been substantially lower than $15,000.00 by the time his monthly payment was increased to $700.00 in 2020. After scrutinizing the internal coherence of the figures provided by Barkley at trial, the magistrate found that his "allegations are mathematically inconsistent." (Doc. 34).

**{¶31}** As to the documentary evidence produced at trial, the magistrate found that Barkley's exhibits often "did not match his claims" as the receipts were difficult to connect "to the actual payments made." (Doc. 34). The magistrate observed that these "poorly maintained" records were more consistent with a lease agreement because "once a month to month, long term oral lease tenant pays the rent, there is little reason to remember past filing tax returns the following year." (Doc. 34). The

magistrate concluded that a "land contract would require a person to . . . maintain far better records." (Doc. 34).

{¶32} As to other terms in the alleged land contract, Barkley could not recall what the alleged written agreement stated about who was to bear the costs of property taxes and insurance. However, he testified that he did not pay any property taxes on the house and only carried renter's insurance. Barkley stated that he thought his monthly payments were supposed to cover the property taxes and homeowner's insurance. The magistrate noted that, in this process, Barkley "acted as a renter, not an owner" and that a "land contract would require a person to remember far more details . . . ." (Doc. 34).

{¶33} In contrast, Maynard testified that, while Barkley had approached him with an offer to buy the house at issue, no land contract for the property had ever existed. Maynard stated that he had purchased the house for $44,000.00 and entered into an oral lease agreement in which Barkley agreed to rent this property for $615.00 a month. He also testified that, in 2015, he adjusted Barkley's monthly payment to $700.00 as a periodic increase in rent. The magistrate noted that the change in monthly payments was consistent with a lease agreement that raised the rent over time.

{¶34} Maynard also stated that, in 2004, he entered into a verbal contract under which Barkley was to conduct a $10,000.00 renovation of the house but

clarified that this sum was not a loan. He testified that Barkley had performed for him work on a number of rental properties and was supposed to renovate the house that he was renting under their agreement. When asked about the substantial improvements that Barkley had made to the house, Maynard reiterated that Barkley had "wanted to buy" the property; "acted like he owned the house"; and did not report the extent of his renovations. (Tr. 32). Maynard also stated that the "rent was 615 and not a thousand six hundred" a month because Barkley "was to maintain the house" pursuant to their oral lease agreement. (Tr. 31).

{¶35} Maynard's testimony indicated that he had entered land contracts with around four purchasers over the years but that he had provided these individuals with a copy of the relevant paperwork. He admitted that he had not recorded these prior land contracts because he was not aware of this practice. His current property manager, Metz, testified that Maynard handled the land contracts but that she was unaware of any land contract with between Maynard and Barkley. She also testified that she had received payments from Barkley but stated that Barkley's property was not in the regular rental payment files.

{¶36} Barkley's testimony suggests that his method of monthly payments may have been unique since he worked for Maynard. Barkley testified that on "a lot of jobs" he would not get paid by Maynard for "a month or so." (Tr. 94). Barkley testified that, on these occasions, he would meet Maynard "at the bank"; that

Maynard would "cash the check"; and would then "say, 'Well, this is what you owe Menard's, this is what you owe Lowe's, this is what you owe me, and this is what you got left." (Tr. 94). Barkley also testified that, on other occasions, he would make payments with money orders or cashier's checks.

{¶37} After examining the accounts given by the plaintiff and defendant, Barkley could not "maintain a consistent story or claim even at a hearing after months to prepare." (Doc. 34). The magistrate concluded that, to prevail, Barkley "would need to prove the terms of the alleged written agreement" but that he presented an "inconsistent and contradictory story" that was "not . . . believable." (Doc. 34). The magistrate also found that Barkley's "story of an unwritten land contract was not believable" and that he failed to establish the terms of the alleged agreement. (Doc. 34). After this analysis, the finder of fact concluded that Barkley "has not proven that he has an enforceable land contract with the Plaintiff . . . ." (Doc. 34). In contrast, the magistrate found that Maynard "made a reasonably straightforward argument" that was "credible." (Doc. 34). The magistrate then concluded that the parties "had an oral lease agreement" and that Maynard was entitled to restitution of the premises for Barkley's nonpayment of rent. (Doc. 34).

{¶38} On appeal, Barkley argues against this conclusion by pointing to the testimony of several witnesses he called at trial. Three of these witnesses testified that Barkley had said that he was purchasing the house from Maynard or had a land

contract with Maynard. However, none of these three witnesses gave any testimony suggesting that they heard Maynard indicate that a land contract existed for the house. A fourth witness, Michael Wilson, testified that he heard Maynard say that he "owe[d Barkley] . . . the house." (Tr. 54). But on cross-examination, he admitted that he did not know what Maynard meant by this comment and that he never heard Maynard mention that he had a land contract with Barkley for the property at issue.

{¶39} The fifth witness, Danielle Kochis, was Barkley's fiancé. She testified that she overheard Barkley ask Maynard for the papers to the house and that Maynard said that Barkley owed him $15,000.00. On cross-examination, she admitted that she had never seen a land contract and did not know whether a land contract had ever existed. The final witness, Lora Davie, had worked as Maynard's property manager for eight months until he terminated her employment. She testified that she handled the payments that came from the rental properties but that Maynard handled the land contracts. She further testified that she did not receive payments from Barkley because he had a land contract with Maynard.

{¶40} In examining this testimony, we again note that the finder of fact determined that Barkley's testimony failed to establish the terms of the alleged land contract. This identified deficiency is not cured by the testimony of these six other witnesses as their statements do not describe a single term—essential or otherwise—that was contained in the alleged agreement between Maynard and Barkley. The

doctrine of part performance requires proof of the essential terms of the agreement. Barkley and the witnesses that he called at trial did not meet this requirement.

**{¶41}** Further, in examining the evidence in the record, we note that Barkley's actions are not exclusively referable to an oral land contract as would be required for the doctrine of part performance to apply in this situation. Rather, as noted by the magistrate, Barkley's actions can be better explained by the oral lease agreement described by Maynard and the circumstances surrounding their working relationship than by the existence of the alleged oral land contract. Thus, we conclude that Barkley has failed to establish each of the elements of the doctrine of part performance by clear and convincing evidence.

**{¶42}** In his second argument, Barkley also argues that the alleged oral agreement should be removed from the statute of frauds pursuant to the doctrine of promissory estoppel. This equitable doctrine "comes into play where the requisites of contract are not met, yet the promise should be enforced to avoid injustice." *Olympic Holding Co., L.L.C. v. ACE Ltd.*, 2009-Ohio-2057, ¶ 39, quoting *Doe v. Univision Television Group, Inc.*, 717 So.2d 63, 65 (Fla. App. 1998).

> To prevail on a claim for promissory estoppel, a party must establish four elements: (1) there must be a clear and unambiguous promise, (2) the party to whom the promise was made must rely on it, (3) the reliance must be reasonable and foreseeable, and (4) the party relying on the promise must have been injured by the reliance.

*Baber v. Ohio Mutual Insurance Co.*, 2021-Ohio-1625, ¶ 17 (3d Dist.), quoting *Zapata Real Estate, L.L.C. v. Monty Realty, Ltd.*, 2014-Ohio-5550, ¶ 35 (8th Dist.). "The party asserting promissory estoppel bears the burden of proving, by clear and convincing evidence, all the elements of the claim." *Yorkland, Ltd. v. Kildow*, 2025-Ohio-152, ¶ 28 (5th Dist.).

{¶43} However, "[c]ourts generally apply the promissory-estoppel exception to the statute of frauds defense 'only in narrow circumstances.'" *Sode v. Muskingum County Court of Common Pleas*, 2019-Ohio-4647, ¶ 14 (5th Dist.), quoting *HAD Ents. v. Galloway*, 2011-Ohio-57, ¶ 26 (4th Dist.). For promissory estoppel to preclude the operation of the statute of frauds, "there must be 'either a misrepresentation that the statute of fraud's requirements have been complied with or a promise to make a memorandum of the agreement.'" *Yorkland* at ¶ 28, quoting *Galloway* at ¶ 26. *See Roth v. Natl. City Bank*, 2010-Ohio-5812, ¶ 15 (1st Dist.); *McCarthy, Lebit, Crystal & Haiman Co., L.P.A. v. First Union Mgt., Inc.*, 87 Ohio App.3d 613, 627 (8th Dist. 1993); *Wells Fargo Bank, N.A. v. Bielec*, 2014-Ohio-1805, ¶ 23 (10th Dist.); *Huntington v. R.R. Wellington, Inc.*, 2012-Ohio-5935, ¶ 33 (11th Dist.). *See also Duncan v. Fifth Third Bank*, 2019-Ohio-3198, ¶ 11 (2d Dist.). *But see Matter of Estate of McDaniel*, 2023-Ohio-1065, ¶ 64 (7th Dist.).

{¶44} Turning to the facts of the case before us, Barkley testified at trial that he and Maynard "had a verbal agreement" and argues on appeal that this oral land

contract should be removed from the statute of frauds under the doctrine of promissory estoppel. (Tr. 92). However, he did not present evidence that this alleged oral agreement was accompanied by a misrepresentation about compliance with the statute of frauds or a promised memorandum for the agreement.[5] *See Yorkland* at ¶ 28. Given the facts of this case, we conclude that Barkley has failed to present clear and convincing evidence that demonstrates that the doctrine of promissory estoppel creates an exception to the statute of frauds in this case.[6]

**{¶45}** In conclusion, Barkley has failed to demonstrate that the trial court erred in concluding that he and Maynard had entered into an oral lease agreement. Further, Barkley does not dispute that he had not made monthly payments to Maynard since 2022. For this reason, he failed to establish that the trial court erred in granting the requested FED. Accordingly, the second assignment of error is overruled.

---

[5] Beyond the fact that Barkley only raises arguments based on the oral land contract on appeal, we also note that none of the testimony regarding the alleged written land contract tends to support the applicability of this exception as Barkley did not allege that Maynard made any misrepresentations about compliance with the statute of frauds or made any promises about writing a memorandum. Thus, even if the finder of fact had not found the allegations surrounding the alleged written land contract to be "false," this testimony about the alleged written land contract would still not be relevant to this exception. (Doc. 30).

[6] In this argument, we limit our analysis of the applicability of the doctrine of promissory estoppel to the extent that it could operate as an exception to the statute of frauds and could potentially give Barkley a possessory interest in the property at issue because, as noted under the third assignment of error, the trial court has only issued a final order that decided Maynard's FED action and has not yet issued a final order regarding Barkley's counterclaims.

*Third Assignment of Error*

**{¶46}** Barkley challenges the magistrate's decision, arguing that the trial court should not dismiss his counterclaims.

Legal Standard

**{¶47}** A reviewing court considers whether it has jurisdiction over a matter, "even if neither party raises the issue." *Smith v. Platinum Property Mgt.*, 2024-Ohio-5687, ¶ 4 (1st Dist.). "Ohio courts of appeal have jurisdiction to review only final, appealable orders of lower courts within their district." *Johnson v. Stone*, 2019-Ohio-4630, ¶ 11 (3d Dist.). "An order is a final, appealable order only if it meets the requirements of both R.C. 2505.02 and, if applicable, Civ.R. 54(B)." *Lycan v. Cleveland*, 2016-Ohio-422, ¶ 21.

**{¶48}** R.C. 2505.02(B)(2) states that final orders include "[a]n order that affects a substantial right made in a special proceeding . . . ." In turn, R.C. 2505.02(A) contains the following definitions:

> (1) 'Substantial right' means a right that the United States Constitution, the Ohio Constitution, a statute, the common law, or a rule of procedure entitles a person to enforce or protect.

> (2) 'Special proceeding' means an action or proceeding that is specially created by statute and that prior to 1853 was not denoted as an action at law or a suit in equity.

R.C. 2505.02(A)(1)-(2). "An order that affects a substantial right is one which, if not immediately appealable, would foreclose appropriate relief in the future."

*Jezerinac v. Dioun*, 2023-Ohio-2882, ¶ 26 (10th Dist.), quoting *Epic Properties v. OSU LaBamba, Inc.*, 2007-Ohio-5021, ¶ 13 (10th Dist.).

**{¶49}** Courts have held that, pursuant to the relevant definitions in R.C. 2505.02, an order that affects the right to the possession of property in a forcible entry and detainer action constitutes a final, appealable order. *McCarty v. Evans*, 2003-Ohio-1522, ¶ 8 (4th Dist.); *Skillman v. Browne*, 68 Ohio App.3d 615, 619 (6th Dist. 1990); *Sheehe v. Demsey*, 2014-Ohio-305, ¶ 6 (8th Dist.); *Blosser v. Bowman*, 2001 WL 436088, *1 (10th Dist. May 1, 2001); *Knop v. Davet*, 2017-Ohio-1416, ¶ 8 (11th Dist.); *Wells Fargo Bank, N.A. v. Washington*, 2015-Ohio-2988, ¶ 15 (12th Dist.).

**{¶50}** Further, "[b]ecause actions in forcible entry and detainer are special proceedings, a judgment giving present possession is immediately appealable even though all claims have not been adjudicated." *Knop* at ¶ 8. *See also Bryan v. Johnston*, 2012-Ohio-2703, ¶ 5 (7th Dist.); *Colombo Ent., Inc. v. Fegan*, 142 Ohio App.3d 551, 554 (8th Dist. 2001); *Blosser* at *1. *See also Blank v. Allenbaugh*, 2018-Ohio-2582, ¶ 7 (11th Dist.) ("A forcible entry and detainer action decides the right to immediate possession of the property and nothing else.").

**{¶51}** In contrast, magistrate's decisions "are interlocutory by nature." *Bland v. Building for the Future Management, LLC*, 2024-Ohio-5391, ¶ 15 (8th

Dist.), quoting *Walsh v. Walsh*, 2020-Ohio-6998, ¶ 6 (11th Dist.). Thus, a magistrate's decision is "tentative" and "subject to change or reconsideration." *Id.*

> The decision remains interlocutory until the trial court reviews the magistrate's decision and (1) rules on any objections, (2) adopts, modifies, or rejects the decision, and (3) enters a judgment that determines all the claims for relief in the action or determines that there is no just reason for delay.

*In re A.M.*, 2020-Ohio-2666, ¶ 11 (3d Dist.), quoting *Alexander v. LJF Mgt., Inc.*, 2010-Ohio-2763, ¶ 12 (1st Dist.). For these reasons, "[a] magistrate's decision is not a final appealable order, because it has no effect until adopted by a court." *Smith*, 2024-Ohio-5687, ¶ 7.

### Legal Analysis

**{¶52}** In this case, the magistrate issued a decision, stating that Maynard should be granted restitution of the premises and that Barkley's counterclaims should be dismissed with prejudice. On August 16, 2024, the trial judge signed an order that granted Maynard's "request for a forcible entry and detainer." (Doc. 35). Thus, the record contains a final, appealable order that disposed of the issues surrounding Maynard's FED action.

**{¶53}** The trial court's August 16, 2024 order then specified that "the other remaining claims will be addressed after ruling on any objections." (Doc. 35). The record before us does not contain a subsequent order from the trial court that

addresses Barkley's counterclaims. While addressed by the magistrate's decision, these counterclaims are not the subject of a final, appealable order.

**{¶54}** The challenges Barkley raises in this assignment of error ultimately address how the magistrate's decision handled his counterclaims. But in the absence of a final order to review, this Court lacks jurisdiction to consider the arguments arising solely from these counterclaims. Accordingly, the third assignment of error is denied for lack of jurisdiction.

*Conclusion*

**{¶55}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Marion County Court of Common Pleas is affirmed.

*Judgment Affirmed*

**ZIMMERMAN and MILLER, J.J., concur.**

Case No. 9-24-41

# **<u>JUDGMENT ENTRY</u>**

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. See App.R. 30.

John R. Willamowski, Judge

William R. Zimmerman, Judge

Mark C. Miller, Judge

DATED:
/hls